UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 22-cr-20243-BLOOM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

NAREY PEREZ-QUIBUS,

    Defendant.

_____/

**ORDER ON MOTION TO SUPPRESS**

**THIS CAUSE** is before the Court upon Defendant Narey Perez-Quibus's ("Defendant" or "Perez-Quibus") Motion to Suppress, ECF No. [18] ("Motion"). Plaintiff the United States of America ("Plaintiff" or "Government") filed a Response in Opposition, ECF No. [23] ("Response"), to which Defendant filed a Reply, ECF No. [24] ("Reply"). The Court held an evidentiary hearing on September 27, 2022 ("Hearing") and considered testimony and other evidence together with the parties' oral argument. ECF No. [25]. The Court has carefully reviewed the Motion, the supporting and opposing filings, the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, the Motion is denied.

**I.**    **BACKGROUND**

On June 7, 2022, a grand jury sitting in the Southern District of Florida returned an Indictment against Defendant charging him with one count of possession of a firearm and ammunition by a convicted felon and one count of possession of ammunition by a convicted felon, both in violation of 18 U.S.C. § 922(g)(1). ECF No. [1].

Defendant now moves for an order suppressing evidence found after an unreasonable seizure and search of Defendant and the vehicle in which he was sitting. Defendant contends that the arrest took place in the home's curtilage, no probable cause existed to believe a traffic violation had occurred, and the warrantless arrest and subsequent search violated his Fourth Amendment rights. The Government responds that Defendant's arrest complied with the Fourth Amendment, and the ammunition found on Defendant's person and the weapon found in his vehicle were obtained pursuant to valid searches incident to arrest.

At the Hearing, the Government presented testimony from North Miami Police Department ("NMPD") Detective Osvald Salien and Detective Abraham Zuñiga, introduced three (3) body worn camera videos, and various exhibits, *see* ECF Nos. [28-1]-[28-3]. Defendant introduced the testimony of Albert Rodriguez, an investigator for the Federal Public Defender's office, and various exhibits. *See* ECF Nos. [26-1]-[26-10]. The evidence introduced at the Hearing and the record in this case establish the following facts.

**A. Events Leading to Defendant's Arrest**

On February 2, 2022, Defendant's girlfriend went to the NMPD to report a domestic violence incident involving the Defendant. When she was interviewed, she reported that she and the Defendant became involved in an argument in which Defendant accused her of cheating on him. According to Defendant's girlfriend, she was violently sexually assaulted by Defendant on the balcony of their shared home, and then in their bedroom, before he retrieved a gun from his waistband, pointed it at her head and chest, and told her that he was going to kill her. Defendant demanded his girlfriend's cell phone, which she refused, so he then threw her on the bed, injuring her elbow and back, and then choked her until she passed out. When she awoke on the floor a few moments later, he retrieved a knife, threatened to cut off her tongue, and would not let her leave

the apartment. Eventually, Defendant left the apartment. According to Defendant's girlfriend, Defendant regularly carries a firearm with him, and she also told Detective Salien that Defendant might be driving a blue Toyota, which belongs to Defendant's mother. As a result of Defendant's girlfriend's report, Detective Salien testified that there was probable cause to believe that Defendant had committed domestic violence battery by strangulation, domestic violence battery, sexual battery, aggravated assault with a deadly weapon, and false imprisonment. Detective Salien testified further that he generated a probable cause message in the Miami-Dade County automated system regarding Defendant.

The following day, February 3, 2022, Detective Salien called and spoke with Defendant to inform him about the allegations against him and to give him a chance to turn himself in. According to Detective Salien, Defendant was willing to speak to him, but stated that he had started a new job and needed to get things in order. Detective Salien spoke to Defendant again the next day, and subsequently spoke to Defendant's attorney. Over the next two months, law enforcement remained in contact with Defendant and his attorney, but Defendant did not surrender to authorities.

Detective Salien also generated a PC to Arrest flyer, featuring Defendant's photo, identifying the vehicle he was likely driving, and listing Defendant as being armed and dangerous. ECF No. [28-1]. In addition, Detective Salien alerted NMPD's crime suppression unit and spoke to Detectives Becker, Zuñiga, and Jean-Baptiste. Detective Salien provided the detectives with a brief synopsis of the domestic violence incident involving Defendant and his girlfriend, including Defendant's use of a firearm and knife during the incident. He also provided the detectives a copy of the PC to Arrest flyer.

Detective Zuñiga testified that Detective Salien approached the crime suppression unit and provided information regarding Defendant related to a domestic violence and firearm related case.

According to Detective Zuñiga, Detective Salien shared that the victim was choked and had a gun placed to her head. In efforts to apprehend Defendant, Detective Zuñiga testified that members of his unit passed by the apartment complex where Defendant lived with his girlfriend over the course of several days, but they were unsuccessful in locating him.

### B. The Location of Defendant's Arrest

The house where Defendant was arrested is owned by his mother and is set back off the roadway by a little more than a car length. The front part of the property is comprised of an unenclosed lawn area bordered on either side by intermittently spaced palm trees. The palm trees extend approximately half the length of the yard. At the edge of the lawn and bordering the front of the house is a tile surround of approximately two feet in width. As viewed from the street, there are various potted plants on the tiled area, and a bench on the west side facing the neighbor's yard. In addition, there is a niche housing a statue of Saint Lazarus.

The items on the tiled area sit just below and adjacent to a raised porch area at the front of the house, which is enclosed by a waist-high white metal fence and covered by a roof. Four steps adjacent to the driveway on the side of the house lead up to the patio area and front door.

At the time of Defendant's arrest, he was sitting in a blue Toyota Camry parked on the lawn area in front of the house, and less than two feet away from the tiled area bordering the front of the house.

### C. The Arrest

On April 8, 2022, law enforcement arrested Defendant after Detective Becker observed the Defendant and the vehicle known to be driven by Defendant at his mother's house, at 880 SW 128th Court. *See* ECF No. [26-2]. Detective Becker observed Defendant exit the house and get into a car parked on the front lawn of the residence. After police observed Defendant enter the

vehicle and turn on the ignition, Detectives Becker, Zuñiga, Bernadeau, and Jean-Baptiste then entered the lawn and surrounded the vehicle. After numerous repeated commands by the officers to exit the car, Defendant turned off the car and exited the vehicle. The officers then effectuated a warrantless arrest of Defendant, conducted a search of his person, and a search of the vehicle.

Government's Exhibit 4, Detective Bernadeau's body worn camera footage, depicts the viewpoint of the officers standing by the driver's side of the vehicle in which Defendant was the only passenger. The video depicts Defendant exiting the vehicle, at which point the officers handcuff him, and Detective Zuñiga locates a pouch on Defendant's waistband containing ammunition clips and a set of handcuffs. Detective Becker then observes a holster through the open driver's side car door and states, "he's got a holster." The officers move Defendant away from the car, Detective Zuñiga begins to search the front of the car, and shortly thereafter, Detective Bernadeau opens the back door of the car and observes the gun on the floor of the passenger side back seat. Detective Bernadeau removes the gun from the car. After briefly placing the gun on the roof of the car, Detective Bernadeau takes the pouch containing the handcuffs and ammunition clips, and the gun, and places them on the hood of the car. Detectives Jean-Baptiste and Bernadeau speak with the Defendant next to one of the police cars, when Detective Jean-Baptiste takes the gun and pouch and places them in the trunk of one of the police cars.

Government's Exhibit 2, footage from Detective Jean-Baptiste's body worn camera, depicts that once Defendant is out of the car, Detective Becker observes a holster in plain view in the car, visible through the open driver's side door, and comments, "he has a holster."

Detective Zuñiga's body worn camera, Government's Exhibit 3, depicts him walking up the driveway around the palm trees lining the side of the yard, and toward the back of the car, which is parked less than two feet away from the tile bordering the elevated patio. The car is in

5

drive, until Defendant puts it in park, which can be seen from the outside of the car when the reverse lights briefly flash on the back of the car. Defendant eventually exits the car, at which time the officers handcuff his hands behind his back. As the officers bring Defendant's hands around his back, a pouch is visible on the front of Defendant's pants and contains a set of handcuffs and ammunition clips. Officer Zuñiga removes Defendant's belt and the pouch. Shortly thereafter, Detective Becker can be seen observing a gun holster through the open driver's side door of the car, when he comments "he's got a holster." Defendant can be heard on the footage denying that he has a gun. A few moments later, Detective Zuñiga searches the car, locates the holster on the front passenger seat, and then proceeds to search the car. Eventually, the detectives place Defendant into one of their unmarked vehicles to transport him to the station.

In the Motion and at the Hearing, Defendant argues that the warrantless arrest and searches violated his Fourth Amendment rights. The Government responds that the arrest and searches of Defendant and the vehicle were lawful because police did not need an arrest warrant, and the searches of Defendant's person and the vehicle were lawfully conducted incident to arrest, or alternatively, because exigent circumstances existed.

## II.     LEGAL STANDARD

### A. Warrantless Arrest and Search of the Home and Curtilage

The Supreme Court has made clear the Fourth Amendment protects "the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). While the Supreme Court has determined that warrantless searches and seizures in one's home are presumptively unreasonable, *Payton v. New York*, 445 U.S. 573, 586 (1980), "the Fourth Amendment permits warrantless arrests in public places where an officer has probable cause to believe that a felony has occurred." *United States v.*

*Goddard*, 312 F.3d 1360, 1362 (11th Cir. 2002). Furthermore, the curtilage, "the area 'immediately surrounding and associated with the home,'" is itself "'part of the home . . . for Fourth Amendment purposes'" and is a constitutionally protected area. *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1983)). The Eleventh Circuit has traditionally relied on four factors set forth in *United States v. Dunn*, 480 U.S. 294, 301 (1987), to determine the outer limits of a home's curtilage in the context of a warrantless search and seizure.

> Questions about whether an area is curtilage 'should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.'

*United States v. Stephen*, 823 F. App'x 751, 754 (11th Cir. 2020) (quoting *Dunn*, 480 U.S. at 301). These four *Dunn* "factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the house itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn*, 480 U.S. at 301.

### B. Searches Incident to Arrest

Warrantless searches "are per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). However, since the custodial "arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment . . . a search incident to the arrest requires no additional justification." *United States v. Robinson*, 414 U.S. 218, 235 (1973*)*. "[A] search incident to arrest may only include the arrestee's person and the area within his immediate control." *Arizona v. Gant*, 556 U.S. 332, 339 (2009) (internal quotation marks omitted). Applying only to "the area from within which [an arrestee] might gain possession of a weapon or destructible evidence." *Chimel v.*

*California*, 395 U.S. 752, 763 (1969). However, "circumstances unique to the automobile context justify a search incident to arrest when it is reasonable to believe that evidence of the offense of arrest might be found" in a vehicle recently occupied by the arrestee. *Gant*, 395 U.S. at 335.

### III. ANALYSIS

Defendant raises two arguments that the evidence obtained from the search of Defendant's person and vehicle should be suppressed: (1) the searches took place on the home's curtilage and therefore violated the Fourth Amendment; and (2) there were no exigent circumstances justifying the incursion onto the curtilage of the home to effectuate Defendant's arrest.[1] The Government argues that the arrest and searches did not take place within the curtilage of the home, and therefore no warrant was required. The Government argues in the alternative that the arrest and searches were lawful due to the presence of exigent circumstances. The Court considers each argument in turn.

#### A. Probable Cause to Arrest and Search of Defendant and Vehicle

As a threshold matter, the Court concludes that there was probable cause to arrest Defendant in relation to the domestic violence incident involving his girlfriend. At the Hearing, Defendant conceded that there was probable cause to arrest Defendant based upon the domestic violence incident. Defendant argues that, notwithstanding the probable cause, the officers could not arrest Defendant on the curtilage of the home without a warrant.

Indeed, even when probable cause is present, the Supreme Court has determined that warrantless searches and seizures in one's home and curtilage are unreasonable under the Fourth

---

[1] Defendant also argues that there was no probable cause to believe that a traffic violation had occurred in this case, noting that the arrest form states that his arrest followed a traffic stop. *See* ECF No. [18] at 3-4. In response, the Government agrees, and asserts that it does not seek to justify the searches or arrest in this case on any alleged traffic violation. *See* ECF No. [23] at 6 n.2. As such, Defendant asserts that the validity of his arrest and the searches turns on whether the area in which he was arrested is part of the home's curtilage.

Amendment without an exception to the warrant requirement. *Payton*, 445 U.S. at 586 n.25 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 474-75 (1971)). Thus, the Court must determine whether the warrantless arrest and the subsequent searches took place within the curtilage of the home, as Defendant argues. The Court considers the *Dunn* factors to determine "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *See Dunn*, 480 U.S. at 302.

### i. Proximity of the Area to the Home

First, the Court considers the proximity of the area claimed to be curtilage to the home. *See Dunn,* 480 U.S. at 301. When analyzing the first *Dunn* factor, the Eleventh Circuit has traditionally examined both the distance from the home and the extent to which the disputed area is spatially separate, or set-off, from the home by other structures. *See United States v. Taylor*, 458 F.3d 1201, 1207 (11th Cir. 2006) ("[a]n area that is substantially removed from and separated by other structures from the house is not within its curtilage."). In terms of distance, "[n]either the Supreme Court nor the Eleventh Circuit has defined, in numerical . . . terms, the phrase 'close proximity.'" *United States v. Garrott*, 745 F. Supp. 2d 1206, 1209 (M.D. Ala. 2010).

The evidence shows the home is located on a small lot. The yard in question, located between the home and the public street, extends little more than one car length. Therefore, the entire yard is near the home. At the time of Defendant's arrest and subsequent searches, the car was parked on the lawn in front of the home and closer to the enclosed porch of the home than to the public street. Even so, the front of the car was approximately only three feet from the public street. *See* ECF No. [26-8]. Therefore, the Court finds the first factor to be neutral.

### ii. Enclosure

Second, the Court considers whether the area in which the search and seizure occurred is included within an enclosure surrounding the home. *See Dunn*, 480 U.S. at 302. Courts "[v]iewing the physical layout of [the property] in its entirety" must determine what "serves to demark a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house." *Id*.

The Government contends that the lawn where Defendant was arrested is unenclosed. Defendant disagrees, pointing out the lines of palm trees on either side of the lawn area, which set the area off from the neighbors' property and the driveway. Upon review, however, the Court concludes that the lawn is not included within an enclosure surrounding the home. When viewing the physical layout of the property in its entirety, the lawn or yard area where Defendant was arrested is not enclosed in any significant manner. Importantly, the lines of palm trees on either side would not prevent passage, and neither line extends to the street. In addition, in contrast to the porch area, which is elevated, accessed only through stairs, enclosed by a waist height metal fence, and covered, the lawn area is open to the street, easily accessible, and not surrounded by any other sort of enclosure, natural or otherwise.

Defendant argues that the protections afforded by the Fourth Amendment are not diminished simply because an individual lacks the financial means to afford structural demarcations, relying upon *Collins v. Virginia*, 138 S. Ct. 1663, 1675 (2018). *See also United States v. Ross*, 456 U.S. 798, 822 (1982) ("[T]he most frail cottage in the kingdom is absolutely entitled to the same guarantees of privacy as the most majestic mansion"). However, the *Collins* Court's chief concern was depriving those persons without such resources of "individualized consideration as to whether the areas in which they store their vehicles qualify as curtilage." *See*

*Collins*, 138 S. Ct. at 1675. While the absence of structural demarcations is not dipositive, the Court's individualized assessment of the circumstances in this case lead to the conclusion that the natural enclosures—the lines of palm trees—are insufficient to tip the scales in Defendant's favor.

Thus, the second factor weighs against a finding that the area is curtilage.

### iii. Nature of Usage

Third, the Court evaluates the nature of the area's usage. *See Dunn*, 480 U.S. at 301. In addressing this factor, the Court recognizes that the extent to which activities of the home extend outside vary in suburban versus rural settings. *See United States v. Seidel*, 794 F. Supp. 1098, 1104 (S.D. Fla. 1992). Defendant argues that the presence of a bench, the religious niche or altar, and decorative plants near the yard area evidence that the yard is an extension of the home. The Government asserts that the yard is a small field with nothing other than the car on it.

The Court finds *Stephen* and *United States v. Howard*, No. 20-20147-CR, 2021 WL 3883919, at *1 (S.D. Fla. Aug. 31, 2021), to be instructive on this issue. In *Stephen*, the Eleventh Circuit noted that the portion of a driveway that is "a common area used by the residents . . . solely for parking cars" is not curtilage. 823 F. App'x at 755. In *Howard*, the court found that when lawn chairs decorated the covered and gated carport, the carport was curtilage as it was used for lounging and related purposes. 2021 WL 3883919, at *5. In this case, the area in question is more like the area in *Stephen* used for parking than the carport in *Howard* to which the activity of home life extended. 823 F. App'x at 755; 2021 WL 3883919, at *5.

The body worn camera footage depicts the presence of a small bench, located on a narrow strip of tile abutting the elevated porch, and facing away from where Defendant was arrested. In addition, the religious niche or alter and the decorative plants are also located on the narrow strip of tile, and not in the yard. Simply put, a bench, a religious object, and some decorative plants at

the top portion of the yard adjacent to the elevated porch does not transform the nature of the usage of the entire front yard into an extension of the intimate activities of the home. Although the evidence is unclear if the area was used by residents solely for parking cars, as was the case in *Stephen*, there is no evidence in the record that the area was used for anything other than parking cars. Indeed, Defendant's investigator Rodriguez testified that when he returned to the property to take photographs after Defendant's arrest, Defendant's mother had moved the religious niche or altar because it had been damaged by a car backing into it, further indicating that the area was primarily used for parking.

As a result, the third *Dunn* factor weighs against a finding that the area is curtilage.

### iv. Steps to Protect from Observation

Finally, the Court examines the steps taken to protect the area in question from observation by passersby. *See Dunn*, 480 U.S. at 301. In evaluating this factor, the Court assesses the property "in its entirety." *See id*. at 302. The Government contends that the Defendant was arrested "inside what can only be considered an open field abutting the street." ECF No. [23] at 7. Defendant argues that the yard at issue cannot properly be characterized as an open field when compared to cases illustrating the concept. *See, e.g.*, *Oliver*, 466 U.S. at 181; *Stephen*, 823 F. App'x at 754. However, merely because the yard is not an open field, it necessarily does not follow that it should be deemed curtilage. Indeed, when viewed from the public street, the evidence shows no efforts were made to prevent observation by passersby.

The evidence demonstrates that the portion of the yard where Defendant was arrested is about halfway between the elevated front porch and the public street. When viewed form the public street a few feet away, the area is wide open, unobstructed by any fencing or foliage. The two rows

of trees flanking the area do little to move the needle on this factor. Thus, the fourth factor weighs against a finding that the area is curtilage.

In sum, the portion of the lawn where Defendant was arrested is not an area intimately linked to the home, and therefore not curtilage. As a result, Fourth Amendment protection does not extend to the lawn area where Defendant was arrested. Because officers did not enter the home's curtilage to arrest Defendant, the arrest and incidental search of his person were reasonable.

### v. Search of Defendant's Vehicle

Although police conducted a lawful felony arrest and subsequent search incident to arrest of Defendant's person, Defendant argues that the warrantless search of Defendant's vehicle nevertheless violated his Fourth Amendment rights. The Government responds that the search of the vehicle was a valid search incident to arrest because there was probable cause to believe that the gun Defendant used in the domestic violence incident involving his girlfriend was inside the vehicle. Therefore, the Court must determine whether the search of the vehicle was a lawful search incident to arrest.

Under *Chimel*, police may search incident to arrest only the space within an arrestee's "'immediate control,' meaning the area from within which he might gain possession of a weapon or destructible evidence." *Gant*, 395 U.S. at 335 (quoting *Chimel*, 395 U.S. at 763). However, as the Court previously noted, "circumstances unique to the automobile context justify a search incident to arrest when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle." *Gant*, 395 U.S. at 335.

Here, three factors support a finding that the search of the vehicle was valid and incident to Defendant's arrest: (1) the victim's statement that a gun was used in the commission of the domestic violence incident, (2) the magazines and ammunition obtained from the lawful search of

Defendant's person, and (3) Detective Becker's observation of a holster in plain view on the passenger seat of the vehicle, providing the police with sufficient reason to believe a gun would be found inside the car. Officers knew that Defendant used a handgun and that he typically carried it with him. Furthermore, police found dozens of rounds of ammunition on the Defendant's person mere moments after Defendant exited the car. Unlike an arrest for a traffic violation, where it is unlikely that evidence of the offense of arrest would be found in the vehicle, *Gant*, 395 U.S. at 344 (citing *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001)), it is evident that in this case officers had reason to believe that the gun used in the domestic violence incident, for which Defendant was arrested, could be in the vehicle. Therefore, the warrantless search of Defendant's vehicle was a reasonable search incident to arrest.

Because the Court determines that the arrest and search of Defendant's person did not take place on the curtilage of the home, and that the search of the vehicle was a valid search incident to arrest, the Court does not consider the Government's alternative argument regarding the existence of exigent circumstances.

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendant's Motion, **ECF No. [18]**, is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on October 7, 2022.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record